## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Dienna M. Lash, as administrator of the<br>Estate of Glenn Lash, deceased,<br><br>       Plaintiff<br><br>vs.<br><br>Haresh Motwani, M.D.,<br>   <u>Please Serve At:</u><br>   2133 Vadalabene Dr., Ste. 5b<br>   Maryville, IL 62062<br><br>Robert A. Panico, M.D.,<br>   <u>Please Serve At:</u><br>   9515 Holy Cross Ln<br>   Breese, IL 62230<br><br>Sparta Community Hospital District,<br>   <u>Please Serve At:</u><br>   818 East Broadway Street<br>   Sparta, IL 62286<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br>Case No. 18-<u> 1466 </u><br><br><br>PLAINTIFF DEMANDS TRIAL<br>BY JURY |

## COMPLAINT

## COUNT I - Dr. Haresh Motwani, MD (Survival Act)

COMES NOW Plaintiff, by and through her undersigned counsel, and for Count I of her cause of action against Defendant, HARESH MOTWANI, M.D. (hereinafter "Motwani"), states as follows on information and belief:

1.    Plaintiff is a citizen of the State of Pennsylvania.

2.    Plaintiff's decedent was a citizen of the State of Pennsylvania at the time of his death.

3.    Defendant Haresh Motwani, M.D. is a citizen of the State of Illinois, and resides

and practices medicine within this judicial district.

    4.    Defendant Robert A. Panico, M.D. is a citizen of the State of Illinois, and resides and practices medicine within this judicial district.

    5.    Defendant Sparta Community Hospital District is a citizen of the State of Illinois, as it is a government owned, non-federal hospital district operating within this judicial district.

    6.    The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

    7.    This district is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred," in that a substantial part of the events or omissions giving rise to the claim occurred in Sparta, Illinois.

    8.    At all times relevant, Motwani was a physician licensed to practice medicine in the State of Illinois and holding himself out to patients and the general public as an internist and emergency room physician.

    9.    At all times relevant, Motwani was an officer, agent, employee or representative of Sparta Community Hospital District (hereinafter "SCHDD").

    10.    At all times relevant, Motwani was engaged in the business of providing medical care to patients in Madison and Randolph County, Illinois.

    11.    On or about August 9, 2016, Glenn Lash came under the care of Motwani when Glenn reported to the SCHD emergency room complaining of shortness of breath and chest discomfort.

    12.    As part of the examination and treatment of Glenn, Motwani and the medical staff of SCHD learned that Glenn presented with the following comorbidities:

      a.     58 years old

      b.     Shortness of breath

      c.     Chest discomfort

      d.     Former smoker

      e.     Morbid obesity

      f.     Hypertension (LVH present)

      g.     Hyperlipidemia, with low HDL

      h.     COPD

      i.     Hyperglycemia

      j.     Coronary artery disease

      k.     Congestive heart failure

13.     The testing performed by Motwani and the staff of SCHD revealed the following:

      a.     Hypertension

      b.     Nonspecific ST-T wave changes on EKG

      c.     Elevated white count with a shift to the left

      d.     Elevated glucose

      e.     Hilar enlargement

      f.     Left ventricular hypertrophy

14.     During his treatment of Glenn, Motwani made the following choices:

      a.   Chose not to include acute cardiopulmonary disease in his differential diagnosis.

      b.   Chose not to include acute coronary syndrome in his differential diagnosis.

      c.   Chose not to include impending myocardial infarction in his differential diagnosis.

    d.   Chose not to include acute congestive heart failure in his differential diagnosis.

    e.   Failed to address abnormalities on the chest x-ray.

    f.   Failed to address abnormalities on the EKG

    g.   Failed to consider Glenn's anxiety as cardiac anxiety until proven otherwise by detailed workup and evaluation.

    h.   Failed to recognize that the elevated white count with left shift and the hyperglycemia were signs of acute cardiac disease.

    i.   Failed to provide informed consent to Glenn that his symptoms suggested life-threatening cardiopulmonary disease requiring workup and evaluation.

    j.   Failed to appreciate that Glenn presented with 3-4 of the 5 major risk factors for vascular disease.

    k.   Chose not to admit Glenn to the hospital for workup of the above symptoms.

    l.   Failed to call for an immediate cardiology consultation.

    m.   Failed to call for an immediate pulmonary/critical care consultation.

    n.   Failed to diagnose acute cardiopulmonary disease.

    o.   Failed to treat Glenn's acute cardiopulmonary disease.

    p.   Discharged Glenn less than two hours after admission.

15.    Motwani's conduct as set forth above was negligent.

16.    Motwani's conduct as set forth above violated applicable standards of care.

17.    At the time Motwani examined Glenn, it was the duty of Motwani to possess and employ knowledge and use that degree of skill and care necessary in the proper diagnosis, care, and treatment of Glenn Lash that is ordinarily used by members of his profession and his

specialty.

18.     As a direct and proximate result of one or more of the foregoing negligent acts or omissions, Glenn Lash was found unresponsive the following day.

19.     Upon return to SCHD, Glenn was pronounced dead.

20.     Glenn Lash's damages, as a direct and proximate result of Motwani's breach of duty as described above, are as follows:

a.      Glenn Lash suffered cardiac arrest, which caused his death on August 10, 2016.

b.      Glenn Lash experienced personal injury to his body

c.      Glenn Lash experienced conscious pain and suffering, mental anguish, disability, anxiety and physical impairment prior to his death.

21.     The Illinois Survival Act provides that actions to recover damages for personal injuries and medical negligence survive death. 755 ILCS 5/27-6.

22.     All of the aforementioned occurred prior to the death of Glenn Lash, Deceased, subjecting Motwani to liability pursuant to the Illinois Survival Act (755 ILCS 5/27-6).

23.     An Affidavit from Plaintiff's attorney, and a copy of a written report addressing the culpability of this Defendant, are attached hereto.

WHEREFORE, Plaintiff, pray for judgment against Defendant, HARESH MOTWANI, M.D., in a sum in excess of $75,000.00, and for such other and further relief as the Court deems just and proper in these circumstances. Plaintiff demands a trial by Jury.

_____

<u>**COUNT II - Haresh Motwani, MD**</u>
<u>**(Wrongful Death Act)**</u>
<u>**(Medical Negligence)**</u>

COMES NOW Plaintiff, by and through her undersigned counsel, and for Count II of her cause of action against Defendant, HARESH MOTWANI, MD, states as follows:

1-23.   Plaintiff incorporates by reference paragraphs 1–23, inclusive, of Count I as paragraphs 1–23 of Count II.

24.   The Illinois Wrongful Death Act provides, "Whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who or company or corporation which would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured." 740 ILCS 180/1.

25.   As a direct and proximate result of the breach of duty of defendant Motwani described above, plaintiff Dienna Lash suffered substantial pecuniary loss including the following injuries and damages:

      a.   A loss of money, support, goods, benefits and services reasonably likely to have been provided by Glenn Lash from the time of his death into the future;

      b.   Loss of society, companionship, and consortium;

      c.   Grief, sorrow and mental and physical suffering; and

      d.   Other damages that will be proved at trial.

26.   An Affidavit from Plaintiff's attorney, and a copy of a written report addressing the culpability of this Defendant, are attached hereto.

WHEREFORE, Plaintiff, pray for judgment against Defendant, HARESH MOTWANI, MD, in a sum in excess of $75,000.00, and for such other and further relief as the Court deems

just and proper in these circumstances. Plaintiff demands a trial by Jury.

## COUNT III - Robert A. Panico, MD
### (Survival Act)

COMES NOW Plaintiff, by and through her undersigned counsel, and for Count III of her cause of action against Defendant, ROBERT PANICO, M.D. (hereinafter "Panico"), states as follows:

1-7.    Plaintiff incorporates by reference paragraphs 1–7, inclusive, of Count I as paragraphs 1–7 of Count III.

8.      At all times relevant, Panico was a physician licensed to practice medicine in the State of Illinois and holding himself out to patients and the general public as a radiologist.

9.      At all times relevant, Panico was an officer, agent, employee or representative of SCHD.

10.     At all times relevant, Panico was engaged in the business of providing medical care to patients in Randolph County, Illinois.

11.     On or about August 9, 2016, Glenn Lash came under the care of Panico when Glenn reported to the SCHD emergency room complaining of shortness of breath and chest discomfort.

12.     As part of the examination and treatment of Glenn, Panico and the medical staff of SCHD learned that Glenn presented with the following comorbidities:

    a.   58 years old

    b.   Shortness of breath

    c.   Chest discomfort

    d.   Former smoker

    e.   Morbid obesity

f.   Hypertension (LVH present)

g.   Hyperlipidemia, with low HDL

h.   COPD

i.   Hyperglycemia

j.   Coronary artery disease

k.   Congestive heart failure

13.   The testing performed by Panico and the staff of SCHD revealed the following:

a.   Hypertension

b.   Nonspecific ST-T wave changes on EKG

c.   Elevated white count with a shift to the left

d.   Elevated glucose

e.   Hilar enlargement

f.   Left ventricular hypertrophy

14.   During his treatment of Glenn, Panico made the following choices:

a.   Chose not to include acute cardiopulmonary disease in his differential diagnosis.

b.   Chose not to include acute coronary syndrome in his differential diagnosis.

c.   Chose not to include impending myocardial infarction in his differential diagnosis.

d.   Chose not to include acute congestive heart failure in his differential diagnosis.

e.   Failed to address abnormalities on the chest x-ray.

f.   Failed to address abnormalities on the EKG.

g.   Failed to consider Glenn's anxiety as cardiac anxiety until proven otherwise by detailed workup and evaluation.

h.   Failed to recognize that the elevated white count with left shift and the hyperglycemia were signs of acute cardiac disease.

    i.   Failed to provide informed consent to Glenn that his symptoms suggested life-threatening cardiopulmonary disease requiring workup and evaluation.

    j.   Failed to appreciate that Glenn presented with 3-4 of the 5 major risk factors for vascular disease.

    k.   Chose not to admit Glenn to the hospital for workup of the above symptoms.

    l.   Failed to call for an immediate cardiology consultation.

    m.  Failed to call for an immediate pulmonary/critical care consultation.

    n.   Failed to diagnose acute cardiopulmonary disease.

    o.   Failed to treat Glenn's acute cardiopulmonary disease.

    p.   Chose not to speak with Motwani to discuss the findings on the diagnostic films.

    q.   Chose not to speak with any other member of the SCHD staff about the findings on the diagnostic films.

    r.   Discharged Glenn less than two hours after admission.

15.   Further, Pancio:

    a.   failed to alert Motwani or the SCHD staff that Glenn had very abnormal chest x-ray findings that required stat admission, workup and evaluation, when he read this abnormal chest x-ray ten and one half hours before Glenn arrested, missing an opportunity to save his life;

    b.   failed to alert Motwani or the SCHD staff of abnormalities in Glenn's EKG.

16.   Panico's conduct as set forth above was negligent.

17.   Panico's conduct as set forth above violated applicable standards of care.

18.   At the time Panico examined Glenn's diagnostic films, it was the duty of Panico to possess and employ knowledge and use that degree of skill and care necessary in the proper

diagnosis, care, and treatment of Glenn Lash that is ordinarily used by members of his profession and his specialty.

19.     As a direct and proximate result of one or more of the foregoing negligent acts or omissions, Glenn Lash was found unresponsive on August 10, 2016.

20.     Upon return to SCHD, Glenn was pronounced dead.

21.     Glenn Lash's damages, as a direct and proximate result of Panico's breach of duty as described above, are as follows:

      a.  Glenn Lash suffered cardiac arrest, which caused his death on August 10, 2016.

      b.  Glenn Lash experienced personal injury to his body

      c.  Glenn Lash experienced conscious pain and suffering, mental anguish, disability, anxiety and physical impairment prior to his death.

22.     The Illinois Survival Act provides that actions to recover damages for personal injuries and medical negligence survive death. 755 ILCS 5/27-6.

23.     All of the aforementioned occurred prior to the death of Glenn Lash, Deceased, subjecting Panico to liability pursuant to the Illinois Survival Act (755 ILCS 5/27-6).

24.     An Affidavit from Plaintiff's attorney, and a copy of a written report addressing the culpability of this Defendant, are attached hereto.

WHEREFORE, Plaintiff, pray for judgment against Defendant, ROBERT PANICO, M.D., in a sum in excess of $75,000.00, and for such other and further relief as the Court deems just and proper in these circumstances. Plaintiff demands a trial by Jury.

_____

<u>**COUNT IV - Robert Panico, MD**</u>
<u>**(Wrongful Death Act)**</u>
<u>**(Medical Negligence)**</u>

COMES NOW Plaintiff, by and through her undersigned counsel, and for Count IV of her cause of action against Defendant, ROBERT PANICO, states as follows:

1-24.   Plaintiff incorporates by reference paragraphs 1–24, inclusive, of Count III as paragraphs 1–24 of Count IV.

24.   The Illinois Wrongful Death Act provides, "Whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who or company or corporation which would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured." 740 ILCS 180/1.

25.   As a direct and proximate result of the breach of duty of defendant Panico described above, plaintiff Dienna Lash suffered substantial pecuniary loss including the following injuries and damages:

    a.   A loss of money, support, goods, benefits and services reasonably likely to have been provided by Glenn Lash from the time of his death into the future;

    b.   Loss of society, companionship, and consortium;

    c.   Grief, sorrow and mental and physical suffering; and

    d.   Other damages that will be proved at trial.

26.   An Affidavit from Plaintiff's attorney, and a copy of a written report addressing the culpability of this Defendant, are attached hereto.

WHEREFORE, Plaintiff, pray for judgment against Defendant, ROBERT PANICO,

MD, in a sum in excess of $75,000.00, and for such other and further relief as the Court deems

just and proper in these circumstances. Plaintiff demands a trial by Jury.

### COUNT V – Sparta Community Hospital District
### (Survival Act)

COMES NOW Plaintiff, by and through her undersigned counsel, and for Count V of her

cause of action against Defendant, SPARTA COMMUNITY HOSPITAL DISTRICT

(hereinafter "SCHD"), states as follows:

1-7.    Plaintiff incorporates by reference paragraphs 1–7, inclusive, of Count I as

paragraphs 1–7 of Count V.

8.      At all times relevant, Defendants Motwani and Panico were officers, agents,

employees or representatives of SCHD.

9.      At all times relevant, SCHD was engaged in the business of providing medical care

to patients in Randolph County, Illinois by and through its officers, agents, employees and

representatives.

10.     On or about August 9, 2016, Glenn Lash came under the care of SCHD when

Glenn reported to the SCHD emergency room complaining of shortness of breath and chest

discomfort.

11.     As part of the examination and treatment of Glenn, SCHD by and through its

agents learned that Glenn presented with the following comorbidities:

    a.   58 years old

    b.   Shortness of breath

    c.   Chest discomfort

12

    d.  Former smoker

    e.  Morbid obesity

    f.  Hypertension (LVH present)

    g.  Hyperlipidemia, with low HDL

    h.  COPD

    i.  Hyperglycemia

    j.  Coronary artery disease

    k.  Congestive heart failure

12.    The testing performed by SCHD, by and through its agents revealed the following:

a.  Hypertension

b.  Nonspecific ST-T wave changes on EKG

c.  Elevated white count with a shift to the left

d.  Elevated glucose

e.  Hilar enlargement

f.  Left ventricular hypertrophy

13.    During his treatment of Glenn, SCHD agents made the following choices:

a.  Chose not to include acute cardiopulmonary disease in his differential
diagnosis.

b.  Chose not to include acute coronary syndrome in his differential diagnosis.

c.  Chose not to include impending myocardial infarction in his differential
diagnosis.

d.  Chose not to include acute congestive heart failure in his differential diagnosis.

e.  Failed to address abnormalities on the chest x-ray.

f.  Failed to address abnormalities on the EKG

g.  Failed to consider Glenn's anxiety as cardiac anxiety until proven otherwise by detailed workup and evaluation.

h.  Failed to recognize that the elevated white count with left shift and the hyperglycemia were signs of acute cardiac disease.

i.  Failed to provide informed consent to Glenn that his symptoms suggested life-threatening cardiopulmonary disease requiring workup and evaluation.

j.  Failed to appreciate that Glenn presented with 3-4 of the 5 major risk factors for vascular disease.

k.  Chose not to admit Glenn to the hospital for workup of the above symptoms.

l.  Failed to call for an immediate cardiology consultation.

m.  Failed to call for an immediate pulmonary/critical care consultation.

n.  Failed to timely diagnose acute cardiopulmonary disease.

o.  Failed to timely treat Glenn's acute cardiopulmonary disease.

p.  Chose not to speak with Motwani to discuss the findings on the diagnostic films.

q.  Chose not to speak with any other member of the SCHD staff about the findings on the diagnostic films.

r.  Discharged Glenn less than two hours after admission.

14.  SCHD's conduct, by and through its agents, as set forth above was negligent.

15.  SCHD's conduct, by and through its agents, as set forth above violated applicable standards of care.

16.  At the time SCHD's agents provided medical care to Glenn, it was the duty of SCHD's agents to possess and employ knowledge and use that degree of skill and care necessary in the proper diagnosis, care, and treatment of Glenn Lash that is ordinarily used by members of

This is page 15 of 32

the medical profession.

17.     As a direct and proximate result of one or more of the foregoing negligent acts or omissions, Glenn Lash was found unresponsive the following day.

18.     Upon return to SCHD, Glenn was pronounced dead.

19.     Glenn Lash's damages, as a direct and proximate result of SCHD's agents' breach of duty as described above, are as follows:

      a.   Glenn Lash suffered cardiac arrest which caused his death on August 10, 2016.

      b.   Glenn Lash experienced personal injury to his body

      c.   Glenn Lash experienced conscious pain and suffering, mental anguish, disability, anxiety and physical impairment prior to his death.

20.     The Illinois Survival Act provides that actions to recover damages for personal injuries and medical negligence survive death. 755 ILCS 5/27-6.

21.     All of the aforementioned occurred prior to the death of Glenn Lash, Deceased, subjecting SCHD to liability pursuant to the Illinois Survival Act (755 ILCS 5/27-6).

22.     An Affidavit from Plaintiff's attorney, and a copy of a written report addressing the culpability of this Defendant, are attached hereto.

WHEREFORE, Plaintiff, pray for judgment against Defendant, SPARTA COMMUNITY HOSPITAL DISTRICT, in a sum in excess of $75,000.00, and for such other and further relief as the Court deems just and proper in these circumstances. Plaintiff demands a trial by Jury.

### COUNT VI – Sparta Community Hospital District
### (Wrongful Death Act)
### (Medical Negligence)

COMES NOW Plaintiff, by and through her undersigned counsel, and for Count VI of her cause of action against Defendant, SPARTA COMMUNITY HOSPITAL DISTRICT, states as

follows:

1-22.    Plaintiff incorporates by reference paragraphs 1–22, inclusive, of Count V as paragraphs 1–22 of Count VI.

23.    The Illinois Wrongful Death Act provides, "Whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who or company or corporation which would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured." 740 ILCS 180/1.

24.    As a direct and proximate result of the breach of duty of defendant SCHD, by and through its agents as described above, plaintiff Dienna Lash suffered substantial pecuniary loss including the following injuries and damages:

      a. A loss of money, support, goods, benefits and services reasonably likely to have been provided by Glenn Lash from the time of his death into the future;

      b. Loss of society, companionship, and consortium;

      c. Grief, sorrow and mental and physical suffering; and

      d. Other damages that will be proved at trial.

25.    An Affidavit from Plaintiff's attorney, and a copy of a written report addressing the culpability of this Defendant, are attached hereto.

WHEREFORE, Plaintiff, pray for judgment against Defendant, SPARTA COMMUNITY HOSPITAL DISTRICT, in a sum in excess of $75,000.00, and for such other and further relief as the Court deems just and proper in these circumstances. Plaintiff demands a trial by Jury.

Respectfully submitted,

**ARMBRUSTER DRIPPS
WINTERSCHDEIDT & BLOTEVOGEL
LLC**

/s/ Charles W. Armbruster
Charles W. Armbruster #6211630
Roy C. Dripps #6182013
 Michael T. Blotevogel # 6282543
51 Executive Plaza Ct.
Maryville, IL 62062
(800) 917-1529 - Telephone
(800) 927-1529 - Facsimile
charlesa@adwblaw.com
royd@adwblaw.com
mikeb@adwblaw.com

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Dienna M. Lash, as administrator of the | ) | |
| Estate of Glenn Lash, deceased, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 18-___1466_____ |
| | ) | |
| Haresh Motwani, M.D., | ) | |
| Robert A. Panico, M.D., and | ) | |
| Sparta Community Hospital District, | ) | |
|     Defendants. | ) | |

**Affidavit**

Charles W. Armbruster III, the Affiant, being first duly sworn and under oath, according to law, states as follows:

1.     I am over the age of 18 and am competent to testify to the matters set forth below.

2.     I will be the lead attorney of record in this matter.

3.     Pursuant to 735 ILCS 5/2-622, I hereby state that

4.     That the affiant has consulted and reviewed the facts of the case with a health professional who the affiant reasonably believes: (i) is knowledgeable in the relevant issues involved in the particular action; (ii) practices or has practiced within the last 6 years or teaches or has taught within the last 6 years in the same area of health care or medicine that is at issue in the particular action; and (iii) is qualified by experience or demonstrated competence in the subject of the case; that the reviewing health professional has determined in a written report, after a review of the medical record and other relevant material involved in the particular action that there is a reasonable and meritorious cause for the filing of such action; and that the affiant has concluded on the basis of the reviewing health professional's review and consultation that there is a reasonable and meritorious cause for filing of such

action. The written report is from a physician licensed to practice medicine in all its branches.

A copy of the written report, clearly identifying the plaintiff and the reasons for the reviewing

health professional's determination that a reasonable and meritorious cause for the filing of the

action against Defendant Haresh Motwani, M.D. exists, is hereby attached to this affidavit.

Further Affiant Sayeth Not.


_____
Charles W. Armbruster III #6211630


STATE OF _Illinois_____ )
                                                                  ) SS
COUNTY OF _Madison_____ )


Subscribed and sworn to before me, a Notary Public, this _2nd_ day of August, 2018.



_____
                    NOTARY PUBLIC


My Commission Expires:

_12-14-21_____

```
OFFICIAL SEAL
STEFANIE L BAKER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/14/21
```

April 11, 2017     (revised 6/12/18)

W. Jason Gatzulis, Esq
The Law Office of W. Jason Gatzulis
1 N. LaSalle St, 45th Floor
Chicago, IL 60602

Dear Mr. Gatzulis:                   <u>WORK PRODUCT</u>

Thank you for forwarding to me the Sparta Illinois Community Hospital medical records. I reviewed them in detail after our lengthy conversation earlier today.

Glenn E. Lash (DOB 4/8/1958) was a 60-year-old gentleman from Pennsylvania in from out of town for a shooting match at a nearby shooting complex.

On **Sunday, 8/7/16** while in his camper, Mr. Lash started getting shortness of breath and had some chest discomfort, but stated 'the chest discomfort has subsided.' He stated the shortness of breath he has had since then is getting worse.

On **Tuesday, 8/9/1616** , at the 12;37 ER visit to Sparta Community Hospital, vital signs were quite abnormal; blood pressure 151/66, respirations 20, and SO2 of 94%. He was morbidly obese at 6 feet and 264 pounds. The RN triage record and assessment indicated several times that he was reassured, a misguided effort. A history of anxiety was obtained by the physician who saw him subsequently. Shortness of breath and chest pain are cardiopulmonary disease until proven otherwise. Associated anxiety means cardiac anxiety until proven otherwise. The SOC required stat cardiac consultation, admission, and detailed workup and evaluation to include serial cardiac enzymes and transfer to a cath lab for coronary angiogram.

Considering the above, it was ridiculous to give him reassurance at 12:37 and again at 13:45 when the SO2 had only improved to 95% and angina pectoris, acute coronary syndrome, hypoxemia, and congestive heart failure were in the differential diagnosis. At 1400, he had desaturated to 94%, and still no arterial blood gases and serial cardiac enzymes were ordered, and no cardiac consultation and admission to the intensive care unit was prescribed.

The physician described the HPI as no dyspnea on exertion and no chest pain while stating two sentences later that the patient has had chest discomfort and anxiety along with his dyspnea.

A chest x-ray was performed and only revealed to the ER staff right hilar lymph node enlargement. Haresh Motwani MD wrote that "the xrays were interpreted by the radiologist." Negligently, a CT was recommended in the future instead of that date after ICU admission. The ER physician was negligent in missing the left ventricular enlargement, bilateral pleural effusions, and congestive heart failure described by the radiologist in his official reading. He also missed the COPD with mild hyperinflation of the lungs and central fibrosis. The acute heart failure and the COPD explain the low SO2; because of the oxygen dissociation curve, the probability is that the PO2 was in the 60 to 70 range and the PCO2 may have been elevated, completely depending on how much COPD was present.

An EKG showed ST-T wave changes in leads III and aVF and was more likely than not abnormal. The white count was elevated with a shift to the left, best explained by acute cardiac disease and CHF. The blood sugar was elevated at 111; it is well known that many patients presenting with impending MI have insulin resistance and are pre-diabetic, so the ER staff should have been concerned about both abnormalities.

Only one set of cardiac enzymes was performed; they were normal and the patient was negligently discharged home at 14:02 with an SO2 of 94 and without a written asssessment to follow up in one week with his doctor. No assessment whatsoever was documented in the ER medical record, further evidence of shabby and substandard care in a situation where Mr. Lash presented with signs and symptoms of cardiopulmonary disease, acute congestive heart failure, hypertension on admission, low oxygen saturations, hyperglycemia, x-ray evidence of COPD, LVH, and congestive heart failure and evidence of bilateral pleural effusions.

On August 10, 2016, Glenn E. Lash returned to the ER by ambulance unconscious in cardiopulmonary arrest. Attempts to resuscitate him were unsuccessful and he died on that date.

Glenn E. Lash had a problem list which included:
1. Aging male, 60 y/o.
2. Former smoker.
3. Morbid obesity.
4. Hypertension (LVH present).
5. Hyperlipidemia, with low HDL 11/24/12
6. OHD, ASHD (presumed), LVH, CHF with bilateral pleural effusions secondary to advanced coronary artery disease, old inferior infarct, age undetermined (5/10/12), pleural effusions on chest xray 5/10/12.
7. COPD with mild hyperinflation, central fibrosis and low SO2.
8. Left hilar enlargement on chest x-ray, r/o mass.
9. Hyperglycemia, longtime (no A1c ordered).
10. LBS
11. L and R knee pain
12. Achilles tendonitis 3/24/16

In summary, Glenn E. Lash presented on August 9, 2016, with classic signs and symptoms of chest pain, shortness of breath, and cardiac anxiety (until proven otherwise). His blood pressure initially was elevated. The SO2 measured three times in the emergency room was 94, 95, and 94. The chest x-ray was wildly abnormal. The EKG showed nonspecific ST-T wave changes, and in this presentation was abnormal until proven otherwise. The white count was elevated with a shift to the left. The glucose was elevated. With this presentation, Mr. Lash required stat cardiac consult, workup, evaluation, and a coronary angiogram on a stat basis.

There are two important axioms in medicine which all reasonably careful physicians, generalists and specialists alike, know and follow:
1. A doctor's first duty is to protect his patient against serious and life-threatening disease.
2. Early diagnosis leads to early treatment and the best chance for cure, avoidance of pain and suffering, and avoidance of death.
The emergency room physician and other caregivers at Sparta Illinois Community Hospital deviated from the standard of care in their care and treatment of Glenn E. Lash by failing to follow these two important axioms.

Further, they deviated from the standard of care in the following additional ways:
3. They failed to include acute cardiopulmonary disease, acute coronary syndrome, impending MI, and acute congestive heart failure in their differential diagnosis and admit Mr. Lash to the intensive care unit for workup as described above.
4. They missed the very abnormal chest x-ray findings requiring stat admission, workup and evaluation.
5. They missed the abnormalities in the EKG.
6. They failed to consider his anxiety as cardiac anxiety until proven otherwise and rule it out with admission and detailed workup and evaluation.

7.  They failed to put together the elevated white count with left shift and hyperglycemia as signs of acute cardiac disease.

8.  They failed to provide informed consent to Mr. Lash about the possibility that his chest pain, shortness of breath, and anxiety were life-threatening cardiopulmonary disease requiring admission to the hospital for workup and evaluation.  This would have            empowered him to insist on aggressive care.

9.  They failed to appreciate that he had three or four of five major risk factors for vascular disease and absolute evidence of heart disease, considering his LVH, CHF and bilateral pleural effusions.

10.  They failed to make a proper assessment in the record at the August 9, 2016, ER admission with no documentation whatsoever of any cause for his acute illness.  They should have known he had signs and symptoms of acute cardiopulmonary disease,            CHF, COPD, LVH and should have admitted him.

11.  They failed to call for stat cardiology consultation.

12.  They failed to call for stat pulmonary/critical care consultation.

13.  They failed to timely diagnose acute cardiopulmonary disease.

14.  They failed to timely treat his acute cardiopulmonary disease.

These deviations from the standard of care by the emergency room physician and staff at Sparta Illinois Community Hospital directly caused Mr. Lash much pain and suffering, and directly caused his death on August 10, 2016.  Had be been timely diagnosed, worked up and treated, his acute congestive heart failure would have resolved, a coronary revascularization would have taken place, and more likely than not he would be alive today. The radiologist read this critically abnormal chest xray the next day ten and one half hours before he arrested, and failed to alert the patient and the ER, thus missing the last opportunity to save his life.

I hold these opinions to a reasonable degree of medical certainty.

Sincerely,


MD
Medical Group

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Dienna M. Lash, as administrator of the | ) | |
| Estate of Glenn Lash, deceased, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 18- 1466 |
| | ) | |
| Haresh Motwani, M.D., | ) | |
| Robert A. Panico, M.D., and | ) | |
| Sparta Community Hospital District, | ) | |
| Defendants. | ) | |

**Affidavit**

Charles W. Armbruster III, the Affiant, being first duly sworn and under oath, according to law, states as follows:

5.    I am over the age of 18 and am competent to testify to the matters set forth below.

6.    I will be the lead attorney of record in this matter.

7.    Pursuant to 735 ILCS 5/2-622, I hereby state that

8.    That the affiant has consulted and reviewed the facts of the case with a health professional who the affiant reasonably believes: (i) is knowledgeable in the relevant issues involved in the particular action; (ii) practices or has practiced within the last 6 years or teaches or has taught within the last 6 years in the same area of health care or medicine that is at issue in the particular action; and (iii) is qualified by experience or demonstrated competence in the subject of the case; that the reviewing health professional has determined in a written report, after a review of the medical record and other relevant material involved in the particular action that there is a reasonable and meritorious cause for the filing of such action; and that the affiant has concluded on the basis of the reviewing health professional's review and consultation that there is a reasonable and meritorious cause for filing of such

action. The written report is from a physician licensed to practice medicine in all its branches.

A copy of the written report, clearly identifying the plaintiff and the reasons for the reviewing

health professional's determination that a reasonable and meritorious cause for the filing of the

action against Defendant Robert A. Pancio, M.D. exists, is hereby attached to this affidavit.

Further Affiant Sayeth Not.

Charles W. Armbruster III #6211630

STATE OF ___Illinois___ )
                            ) SS
COUNTY OF ___Madison___ )

Subscribed and sworn to before me, a Notary Public, this _2nd_ day of August, 2018.

_____
NOTARY PUBLIC

My Commission Expires:

_12-14-21_

OFFICIAL SEAL
STEFANIE L BAKER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/14/21

April 11, 2017    (revised 6/12/18)


W. Jason Gatzulis, Esq
The Law Office of W. Jason Gatzulis
1 N. LaSalle St, 45th Floor
Chicago, IL 60602

Dear Mr. Gatzulis:                              <u>WORK PRODUCT</u>

Thank you for forwarding to me the Sparta Illinois Community Hospital medical records. I reviewed them in detail after our lengthy conversation earlier today.

Glenn E. Lash (DOB 4/8/1958) was a 60-year-old gentleman from Pennsylvania in from out of town for a shooting match at a nearby shooting complex.

On **Sunday, 8/7/16** while in his camper, Mr. Lash started getting shortness of breath and had some chest discomfort, but stated 'the chest discomfort has subsided.' He stated the shortness of breath he has had since then is getting worse.

On **Tuesday, 8/9/1616** , at the 12;37 ER visit to Sparta Community Hospital, vital signs were quite abnormal; blood pressure 151/66, respirations 20, and SO2 of 94%. He was morbidly obese at 6 feet and 264 pounds. The RN triage record and assessment indicated several times that he was reassured, a misguided effort. A history of anxiety was obtained by the physician who saw him subsequently. Shortness of breath and chest pain are cardiopulmonary disease until proven otherwise. Associated anxiety means cardiac anxiety until proven otherwise. The SOC required stat cardiac consultation, admission, and detailed workup and evaluation to include serial cardiac enzymes and transfer to a cath lab for coronary angiogram.

Considering the above, it was ridiculous to give him reassurance at 12:37 and again at 13:45 when the SO2 had only improved to 95% and angina pectoris, acute coronary syndrome, hypoxemia, and congestive heart failure were in the differential diagnosis. At 1400, he had desaturated to 94%, and still no arterial blood gases and serial cardiac enzymes were ordered, and no cardiac consultation and admission to the intensive care unit was prescribed.

The physician described the HPI as no dyspnea on exertion and no chest pain while stating two sentences later that the patient has had chest discomfort and anxiety along with his dyspnea.

A chest x-ray was performed and only revealed to the ER staff right hilar lymph node enlargement. Haresh Motwani MD wrote that "the xrays were interpreted by the radiologist." Negligently, a CT was recommended in the future instead of that date after ICU admission. The ER physician was negligent in missing the left ventricular enlargement, bilateral pleural effusions, and congestive heart failure described by the radiologist in his official reading. He also missed the COPD with mild hyperinflation of the lungs and central fibrosis. The acute heart failure and the COPD explain the low SO2; because of the oxygen dissociation curve, the probability is that the PO2 was in the 60 to 70 range and the PCO2 may have been elevated, completely depending on how much COPD was present.

An EKG showed ST-T wave changes in leads III and aVF and was more likely than not abnormal. The white count was elevated with a shift to the left, best explained by acute cardiac disease and CHF. The blood sugar was elevated at 111; it is well known that many patients presenting with impending MI have insulin resistance and are pre-diabetic, so the ER staff should have been concerned about both abnormalities.

Only one set of cardiac enzymes was performed; they were normal and the patient was negligently discharged home at 14:02 with an SO2 of 94 and without a written asssessment to follow up in one week with his doctor. No assessment whatsoever was documented in the ER medical record, further evidence of shabby and substandard care in a situation where Mr. Lash presented with signs and symptoms of cardiopulmonary disease, acute congestive heart failure, hypertension on admission, low oxygen saturations, hyperglycemia, x-ray evidence of COPD, LVH, and congestive heart failure and evidence of bilateral pleural effusions.

On August 10, 2016, Glenn E. Lash returned to the ER by ambulance unconscious in cardiopulmonary arrest. Attempts to resuscitate him were unsuccessful and he died on that date.

Glenn E. Lash had a problem list which included:
1. Aging male, 60 y/o.
2. Former smoker.
3. Morbid obesity.
4. Hypertension (LVH present).
5. Hyperlipidemia, with low HDL 11/24/12
6. OHD, ASHD (presumed), LVH, CHF with bilateral pleural effusions secondary to advanced coronary artery disease, old inferior infarct, age undetermined (5/10/12), pleural effusions on chest xray 5/10/12.
7. COPD with mild hyperinflation, central fibrosis and low SO2.
8. Left hilar enlargement on chest x-ray, r/o mass.
9. Hyperglycemia, longtime (no A1c ordered).
10. LBS
11. L and R knee pain
12. Achilles tendonitis 3/24/16

In summary, Glenn E. Lash presented on August 9, 2016, with classic signs and symptoms of chest pain, shortness of breath, and cardiac anxiety (until proven otherwise). His blood pressure initially was elevated. The SO2 measured three times in the emergency room was 94, 95, and 94. The chest x-ray was wildly abnormal. The EKG showed nonspecific ST-T wave changes, and in this presentation was abnormal until proven otherwise. The white count was elevated with a shift to the left. The glucose was elevated. With this presentation, Mr. Lash required stat cardiac consult, workup, evaluation, and a coronary angiogram on a stat basis.

There are two important axioms in medicine which all reasonably careful physicians, generalists and specialists alike, know and follow:
1. A doctor's first duty is to protect his patient against serious and life-threatening disease.
2. Early diagnosis leads to early treatment and the best chance for cure, avoidance of pain and suffering, and avoidance of death.
The emergency room physician and other caregivers at Sparta Illinois Community Hospital deviated from the standard of care in their care and treatment of Glenn E. Lash by failing to follow these two important axioms.

Further, they deviated from the standard of care in the following additional ways:
3. They failed to include acute cardiopulmonary disease, acute coronary syndrome, impending MI, and acute congestive heart failure in their differential diagnosis and admit Mr. Lash to the intensive care unit for workup as   described above.
4. They missed the very abnormal chest x-ray findings requiring stat admission, workup and evaluation.
5. They missed the abnormalities in the EKG.
6. They failed to consider his anxiety as cardiac anxiety until proven otherwise and rule it out with admission and detailed workup and evaluation.

7. They failed to put together the elevated white count with left shift and hyperglycemia as signs of acute cardiac disease.

8. They failed to provide informed consent to Mr. Lash about the possibility that his chest pain, shortness of breath, and anxiety were life-threatening cardiopulmonary disease requiring admission to the hospital for workup and evaluation. This would have       empowered him to insist on aggressive care.

9. They failed to appreciate that he had three or four of five major risk factors for vascular disease and absolute evidence of heart disease, considering his LVH, CHF and bilateral pleural effusions.

10. They failed to make a proper assessment in the record at the August 9, 2016, ER admission with no documentation whatsoever of any cause for his acute illness. They should have known he had signs and symptoms of acute cardiopulmonary disease,      CHF, COPD, LVH and should have admitted him.

11. They failed to call for stat cardiology consultation.

12. They failed to call for stat pulmonary/critical care consultation.

13. They failed to timely diagnose acute cardiopulmonary disease.

14. They failed to timely treat his acute cardiopulmonary disease.

These deviations from the standard of care by the emergency room physician and staff at Sparta Illinois Community Hospital directly caused Mr. Lash much pain and suffering, and directly caused his death on August 10, 2016. Had be been timely diagnosed, worked up and treated, his acute congestive heart failure would have resolved, a coronary revascularization would have taken place, and more likely than not he would be alive today. The radiologist read this critically abnormal chest xray the next day ten and one half hours before he arrested, and failed to alert the patient and the ER, thus missing the last opportunity to save his life.

I hold these opinions to a reasonable degree of medical certainty.

Sincerely,


      MD
Medical Group

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

Dienna M. Lash, as administrator of the    )
Estate of Glenn Lash, deceased,            )
     Plaintiff,                           )
                                           )
vs.                                        )    Case No. 18-__1466_____
                                           )
Haresh Motwani, M.D.,                      )
Robert A. Panico, M.D., and                )
Sparta Community Hospital District,        )
     Defendants.                          )

**Affidavit**

     Charles W. Armbruster III, the Affiant, being first duly sworn and under oath, according to law, states as follows:

9.     I am over the age of 18 and am competent to testify to the matters set forth below.

10.     I will be the lead attorney of record in this matter.

11.     Pursuant to 735 ILCS 5/2-622, I hereby state that

12.     That the affiant has consulted and reviewed the facts of the case with a health professional who the affiant reasonably believes: (i) is knowledgeable in the relevant issues involved in the particular action; (ii) practices or has practiced within the last 6 years or teaches or has taught within the last 6 years in the same area of health care or medicine that is at issue in the particular action; and (iii) is qualified by experience or demonstrated competence in the subject of the case; that the reviewing health professional has determined in a written report, after a review of the medical record and other relevant material involved in the particular action that there is a reasonable and meritorious cause for the filing of such action; and that the affiant has concluded on the basis of the reviewing health professional's review and consultation that there is a reasonable and meritorious cause for filing of such

action. The written report is from a physician licensed to practice medicine in all its branches.

A copy of the written report, clearly identifying the plaintiff and the reasons for the reviewing

health professional's determination that a reasonable and meritorious cause for the filing of the

action against Defendant Sparta Community Hospital District exists, is hereby attached to this

affidavit.

Further Affiant Sayeth Not.


_____
Charles W. Armbruster III #6211630


STATE OF ___Illinois___ )
                                      ) SS
COUNTY OF ___Madison___ )


Subscribed and sworn to before me, a Notary Public, this ___2nd___ day of August, 2018.


_____
NOTARY PUBLIC


My Commission Expires:

___12-14-21___


OFFICIAL SEAL
STEFANIE L BAKER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/14/21

April 11, 2017    (revised 6/12/18)

W. Jason Gatzulis, Esq
The Law Office of W. Jason Gatzulis
1 N. LaSalle St, 45th Floor
Chicago, IL 60602

Dear Mr. Gatzulis:                  <u>WORK PRODUCT</u>

Thank you for forwarding to me the Sparta Illinois Community Hospital medical records. I reviewed them in detail after our lengthy conversation earlier today.

Glenn E. Lash (DOB 4/8/1958) was a 60-year-old gentleman from Pennsylvania in from out of town for a shooting match at a nearby shooting complex.

On **Sunday, 8/7/16** while in his camper, Mr. Lash started getting shortness of breath and had some chest discomfort, but stated 'the chest discomfort has subsided.' He stated the shortness of breath he has had since then is getting worse.

On **Tuesday, 8/9/1616** , at the 12;37 ER visit to Sparta Community Hospital, vital signs were quite abnormal; blood pressure 151/66, respirations 20, and SO2 of 94%. He was morbidly obese at 6 feet and 264 pounds. The RN triage record and assessment indicated several times that he was reassured, a misguided effort. A history of anxiety was obtained by the physician who saw him subsequently. Shortness of breath and chest pain are cardiopulmonary disease until proven otherwise. Associated anxiety means cardiac anxiety until proven otherwise. The SOC required stat cardiac consultation, admission, and detailed workup and evaluation to include serial cardiac enzymes and transfer to a cath lab for coronary angiogram.

Considering the above, it was ridiculous to give him reassurance at 12:37 and again at 13:45 when the SO2 had only improved to 95% and angina pectoris, acute coronary syndrome, hypoxemia, and congestive heart failure were in the differential diagnosis. At 1400, he had desaturated to 94%, and still no arterial blood gases and serial cardiac enzymes were ordered, and no cardiac consultation and admission to the intensive care unit was prescribed.

The physician described the HPI as no dyspnea on exertion and no chest pain while stating two sentences later that the patient has had chest discomfort and anxiety along with his dyspnea.

A chest x-ray was performed and only revealed to the ER staff right hilar lymph node enlargement. Haresh Motwani MD wrote that "the xrays were interpreted by the radiologist." Negligently, a CT was recommended in the future instead of that date after ICU admission. The ER physician was negligent in missing the left ventricular enlargement, bilateral pleural effusions, and congestive heart failure described by the radiologist in his official reading. He also missed the COPD with mild hyperinflation of the lungs and central fibrosis. The acute heart failure and the COPD explain the low SO2; because of the oxygen dissociation curve, the probability is that the PO2 was in the 60 to 70 range and the PCO2 may have been elevated, completely depending on how much COPD was present.

An EKG showed ST-T wave changes in leads III and aVF and was more likely than not abnormal. The white count was elevated with a shift to the left, best explained by acute cardiac disease and CHF. The blood sugar was elevated at 111; it is well known that many patients presenting with impending MI have insulin resistance and are pre-diabetic, so the ER staff should have been concerned about both abnormalities.

Only one set of cardiac enzymes was performed; they were normal and the patient was negligently discharged home at 14:02 with an SO2 of 94 and without a written asssessment to follow up in one week with his doctor. No assessment whatsoever was documented in the ER medical record, further evidence of shabby and substandard care in a situation where Mr. Lash presented with signs and symptoms of cardiopulmonary disease, acute congestive heart failure, hypertension on admission, low oxygen saturations, hyperglycemia, x-ray evidence of COPD, LVH, and congestive heart failure and evidence of bilateral pleural effusions.

On August 10, 2016, Glenn E. Lash returned to the ER by ambulance unconscious in cardiopulmonary arrest. Attempts to resuscitate him were unsuccessful and he died on that date.

Glenn E. Lash had a problem list which included:
1. Aging male, 60 y/o.
2. Former smoker.
3. Morbid obesity.
4. Hypertension (LVH present).
5. Hyperlipidemia, with low HDL 11/24/12
6. OHD, ASHD (presumed), LVH, CHF with bilateral pleural effusions secondary to advanced coronary artery disease, old inferior infarct, age undetermined (5/10/12), pleural effusions on chest xray 5/10/12.
7. COPD with mild hyperinflation, central fibrosis and low SO2.
8. Left hilar enlargement on chest x-ray, r/o mass.
9. Hyperglycemia, longtime (no A1c ordered).
10. LBS
11. L and R knee pain
12. Achilles tendonitis 3/24/16

In summary, Glenn E. Lash presented on August 9, 2016, with classic signs and symptoms of chest pain, shortness of breath, and cardiac anxiety (until proven otherwise). His blood pressure initially was elevated. The SO2 measured three times in the emergency room was 94, 95, and 94. The chest x-ray was wildly abnormal. The EKG showed nonspecific ST-T wave changes, and in this presentation was abnormal until proven otherwise. The white count was elevated with a shift to the left. The glucose was elevated. With this presentation, Mr. Lash required stat cardiac consult, workup, evaluation, and a coronary angiogram on a stat basis.

There are two important axioms in medicine which all reasonably careful physicians, generalists and specialists alike, know and follow:
1. A doctor's first duty is to protect his patient against serious and life-threatening disease.
2. Early diagnosis leads to early treatment and the best chance for cure, avoidance of pain and suffering, and avoidance of death.
The emergency room physician and other caregivers at Sparta Illinois Community Hospital deviated from the standard of care in their care and treatment of Glenn E. Lash by failing to follow these two important axioms.

Further, they deviated from the standard of care in the following additional ways:
3. They failed to include acute cardiopulmonary disease, acute coronary syndrome, impending MI, and acute congestive heart failure in their differential diagnosis and admit Mr. Lash to the intensive care unit for workup as    described above.
4. They missed the very abnormal chest x-ray findings requiring stat admission, workup and evaluation.
5. They missed the abnormalities in the EKG.
6. They failed to consider his anxiety as cardiac anxiety until proven otherwise and rule it out with admission and detailed workup and evaluation.

7.  They failed to put together the elevated white count with left shift and hyperglycemia as signs of acute cardiac disease.

8.  They failed to provide informed consent to Mr. Lash about the possibility that his chest pain, shortness of breath, and anxiety were life-threatening cardiopulmonary disease requiring admission to the hospital for workup and evaluation.  This would have                    empowered him to insist on aggressive care.

9.  They failed to appreciate that he had three or four of five major risk factors for vascular disease and absolute evidence of heart disease, considering his LVH, CHF and bilateral pleural effusions.

10.  They failed to make a proper assessment in the record at the August 9, 2016, ER admission with no documentation whatsoever of any cause for his acute illness.  They should have known he had signs and symptoms of acute cardiopulmonary disease,          CHF, COPD, LVH and should have admitted him.

11.  They failed to call for stat cardiology consultation.

12.  They failed to call for stat pulmonary/critical care consultation.

13.  They failed to timely diagnose acute cardiopulmonary disease.

14.  They failed to timely treat his acute cardiopulmonary disease.


These deviations from the standard of care by the emergency room physician and staff at Sparta Illinois Community Hospital directly caused Mr. Lash much pain and suffering, and directly caused his death on August 10, 2016.  Had be been timely diagnosed, worked up and treated, his acute congestive heart failure would have resolved, a coronary revascularization would have taken place, and more likely than not he would be alive today. The radiologist read this critically abnormal chest xray the next day ten and one half hours before he arrested, and failed to alert the patient and the ER, thus missing the last opportunity to save his life.

I hold these opinions to a reasonable degree of medical certainty.

Sincerely,



          MD
     Medical Group