IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DIENNA M. LASH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:18-CV-01466-MAB |
| | ) | |
| HARESH MOTWANI, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Dienna Lash, as an administrator of her late husband Glenn Lash's estate, filed this medical malpractice suit against physicians Haresh Motwani and Robert Panico, as well as, Sparta Community Hospital District ("Sparta Hospital" or "the hospital") under the Illinois Wrongful Death Act, 740 ILL. COMP. STAT. 180/1, and the Illinois Survival Act, 755 ILL. COMP. STAT. 5/27-6. The Court previously granted summary judgment in favor of Dr. Panico (Doc. 106). Now before the Court are Dr. Motwani and Sparta Hospital's motions for summary judgment and supporting memoranda (Docs. 82, 83, 89, 90). For the reasons outlined below, Sparta Hospital's motion for summary judgment is granted (Doc. 82) and Dr. Motwani's motion for summary judgment is denied (Doc. 89).

## FACTS

As an initial matter, the undisputed facts in this case are not clearly laid out. Defendant Sparta Hospital argues in its reply brief that summary judgment is not contested as Plaintiff does not dispute its uncontested facts (Doc. 93, p. 1). Sparta Hospital

is correct that Plaintiff does not *clearly* contest the facts set forth by Sparta Hospital by going through each fact one-by-one and addressing whether it is disputed or undisputed, as is customary. Rather, Plaintiff sprinkles her contested factual allegations throughout her responses to both Sparta Hospital and Dr. Motwani's motions. This lack of clarity in the facts required the Court to dedicate an inordinate amount of time and energy toward reviewing the factual record, including the exhibits supporting the briefs.[1]

Additionally, Plaintiff submitted six pages of medical records to the Court (Doc. 92-6). It is essentially the discharge instructions given to Mr. Lash, the nursing notes, and the list of orders given by Dr. Motwani (*see id.*). Dr. Panico previously submitted a couple additional pages of medical records (Docs. 79-2, 79-3, 79-4). The Court often had to rely on the recitations of the medical records provided in the deposition testimony of the various medical providers and expert witnesses. The Court has captured, to the best of its abilities, the following factual allegations from all parties and the record as a whole.

## I.      Parties & Timeline of Events

Sparta Hospital was, and is, organized and operating as a Hospital District pursuant to the Illinois Hospital District Act, 70 ILL. COMP. STAT. 910/1, *et seq.* (Doc. 83-2). The parties agree that Sparta Hospital is a "local public entity" as defined by the aforementioned Act (Doc. 83, p. 9). In 2016, Dr. Motwani was an independently contracted physician granted privileges to practice emergency medicine in the emergency department at Sparta Hospital (Doc. 83-3). Dr. Robert Panico (who, again, has already

---

[1] The Seventh Circuit Court of Appeals has astutely observed that "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

been dismissed) was an independently contracted physician granted privileges to practice radiology at Sparta Hospital (*Id.*).

Plaintiff's decedent and husband, Glenn Lash, was a resident of Pennsylvania (Doc. 1). In August 2016, Mr. Lash traveled to Sparta, Illinois to attend a trap shooting event (Doc. 83-1, pp. 12-13). He arrived in Sparta on Friday, August 5, 2016 (Doc. 83-1, p. 17). Four days later, on Tuesday, August 9th, Mr. Lash went to the emergency room at Sparta Community Hospital around midday complaining of chest discomfort and shortness of breath that began two days earlier (Doc. 92-6; Doc. 83-9, p. 2).

Ms. Lash testified that her husband went to Sparta Hospital because it was the closest hospital to where he was staying while visiting southern Illinois (Doc. 83-1, pp. 44–45). She further testified that she did not think her husband cared whether the doctors at the hospital were independent contractors or employees; he just wanted medical care (*Id.* at p. 45). At the hospital, Mr. Lash signed and initialed a consent form for his visit (Doc. 83-4; *see also* Doc. 83-1, pp. 45–46). Section 2.4 of the consent form states in relevant part:

> Physicians on staff, including but not limited to the *emergency physicians*, hospitalists, pathologists, *radiologists*, anesthesia providers, and other specialty or consulting physicians are NOT employees or agents of the hospital and are independent contractors who have been granted the privilege of using the facility of the treatment of their patients. I acknowledge that the employment or agency status of physicians or other providers who treat me is not relevant to my selection of this facility for my care. I recognize that all physicians on the medical staff exercise their own independent medical judgment with respect to my treatment.

(Doc. 83-4) (emphasis added.)

Dr. Motwani was the physician responsible for Mr. Lash's care on August 9, 2016 (Doc. 83-5, pp. 135-136). Mr. Lash was also seen by nurses and other staff members at Sparta Hospital during the time he was in the ER (*see* Doc. 92-6). He was triaged at 12:37pm and communicated to a nurse that his shortness of breath, which started two days prior, was getting worse but the chest discomfort had subsided (Doc. 92-6; Doc. 79-4). He did not report any significant past medical history, such as a prior history of coronary artery disease, heart attack, peripheral vascular disease, stroke, diabetes, hypertension, or hyperlipidemia (*see* Doc. 92-6, Doc. 79-4; Doc. 83-7, pp. 1–2; Doc. 83-8, p. 14). And he did not know of any family history of premature coronary artery disease or sudden cardiac death (*see* Doc. 92-6, Doc. 79-4; Doc. 83-7, pp. 1–2; Doc. 83-8, p. 14).

It was noted that Mr. Lash was a former smoker and obese with a BMI of 36, as he weighed approximately 265 pounds and was 6 feet tall (Doc. 92-6; Doc. 79-4). Mr. Lash's vital signs were taken and recorded; in pertinent part, his blood pressure was 151/66 and his oxygen saturation level was 94% (Doc. 92-6; Doc. 79-4). Plaintiff's experts testified that his blood pressure was elevated (Doc. 83-10, p. 15; *see also* Doc. 83-8, p. 12). His primary care expert testified his oxygen saturation was low (Doc. 83-10, p. 14), while his cardiology expert testified it was "borderline normal" (Doc. 83-8, p. 13). The nurse also noted that Mr. Lash "appeared anxious," but there was no further description of the characteristics of or assessment for anxiety (Doc. 92-6, p. 3).

The nurse then notified Dr. Motwani that Mr. Lash was in the ER, and per protocol, she initiated orders for an EKG, blood work, and a chest x-ray (Doc. 79-9, pp. 7, 13–14; *see also* Doc. 92-6, pp. 3, 5–6). Dr. Motwani then took Mr. Lash's history of his presenting

illness and past medical history and conducted a medical examination (Doc. 83-5, p. 136). On examination, Mr. Lash had clear lungs and regular heart rhythm without murmurs, rubs, or gallops (Doc. 83-7, p. 3). Dr. Motwani verified the nurses orders for an EKG, lab work, and a chest x-ray (Doc. 83-5, pp. 136, 158, 162–63).

A nurse conducted the EKG around 12:47pm (Doc. 92-6, p. 3). At 12:57pm, blood samples were drawn (*Id.*). And at around 1:15, the chest x-ray was performed (*Id.*). The nurse and Dr. Motwani both testified that Mr. Lash's EKG was normal (Doc. 79-9, p. 7; Doc. 83-5, pp. 138, 171, 172), as did Plaintiff's cardiology expert, Dr. Eric Osborn (Doc. 83-7, p. 3; Doc. 83-8, pp. 12–13).[2] Dr. Osborn testified that Mr. Lash's laboratory results were notable for negative cardiac enzymes and troponin within normal limits, which means they did not detect anything in the blood suggesting Mr. Lash had had a heart attack (Doc. 83-7, p. 3; Doc. 83-8, p. 7). However, his white blood cells were slightly elevated, as was his blood sugar (Doc. 79-4, p. 5), both of which can be associated with a cardiac event (Doc. 83-8, pp. 14–15; Doc. 83-10, pp. 16–17). The chest x-ray was read by radiologist, Dr. Robert Panico (Doc. 79-2; Doc. 79-3). His initial "wet read," which is what would have been provided to Dr. Motwani, was that there were radiographic findings of mild

---

[2] On the other hand, Plaintiff's primary care expert, Dr. Finley Brown, testified the EKG was "more likely than not abnormal" (Doc. 83-9, p. 3). Dr. Brown explained that Mr. Lash's white blood cell count was elevated "with a shift to the left, best explained by acute cardiac disease, CHF [congestive heart failure], and/or PE [pulmonary embolism]" (*Id.*).

congestive heart failure and a slightly prominent right hilum,[3] and he said a CT scan should be considered (Doc. 79-3; *see also* Doc. 83-5, pp. 139, 186; Doc. 83-7, p. 3).

Around 1:45pm, a little over an hour after Mr. Lash was first seen, a nurse took his vitals again (Doc. 96-2, p. 3). His blood pressure was 122/57, which is normal, and his oxygen saturation level was 95% (*Id.*; Doc. 83-8, p. 12; Doc. 83-10, p. 16). At this point, Mr. Lash communicated that he felt better as the nurses reassured him multiple times (Doc. 96-2, p. 3).

Dr. Motwani ultimately diagnosed Mr. Lash with anxiety reaction (Doc. 83-5, pp. 136, 199-201, 208-209; Doc. 92-6). At 1:58pm, Mr. Lash was given 0.5mg of Ativan (*Id.*).[4] His vitals were taken again around 2:00pm, and his blood pressure was 131/54, which is normal, and his oxygen saturation level was 94% (Doc. 92-6, p. 4; Doc. 83-8, p. 12; Doc. 83-10, p. 16). He was discharged a few minutes later, after spending approximately an hour and a half in the emergency room (*see* Doc. 92-6, p. 4). Dr. Motwani testified that, essentially, Mr. Lash's physical examination and test results (from his EKG, cardiac enzymes, and chest X-ray, for example) were all normal and supported his decision to discharge Mr. Lash (Doc. 83-5, p. 201).

---

[3] Plaintiff's cardiology expert, Dr. Eric Osborn, described the hilum as a "relatively complex part of the lung that includes airways, lymph nodes, blood vessels, other structures" (Doc. 83-8, p. 10). He testified that an enlarged right hilum could be caused by congestive heart failure or a cancerous mass (*Id.*).

[4] Ativan is a brand name for Lorazepam, which is a benzodiazepine used to relieve anxiety. Medline Plus, *Lorazepam*, https://medlineplus.gov/druginfo/meds/a682053.html#why (last visited Mar. 31, 2021). *See also* Doc. 83-8, p. 18.

The discharge instructions indicated that Mr. Lash had been evaluated and given additional information for "anxiety reaction" (Doc. 92-6, p. 1). He was instructed to continue taking ibuprofen and Norco as ordered, both of which had been prescribed prior to his emergency room visit to be taken as needed for lower back, knee, and Achilles tendon pain (*Id.*; Doc. 83-9, p. 2).[5] Dr. Motwani also gave him a prescription for fifteen Xanax pills (0.25mg) to be taken as needed (Doc. 92-6, p. 1). Finally, Mr. Lash was instructed to "Follow up with your doctor in one week even if well . . . for R Hilar LN enlargement" (*Id.*).

The following evening, Mr. Lash was at a meeting, when he reported feeling dizzy and then collapsed (Doc. 83-1, pp. 25–26). He was taken by ambulance back to Sparta Hospital, unconscious and in cardiac arrest (Doc. 83-7, p. 3; Doc. 83-9, p. 3). Attempts to resuscitate him were unsuccessful and he died roughly 30 hours after he had been discharged from the emergency room with a diagnosis of anxiety (Doc. 83-7, p. 3; Doc. 83-9, p. 3).

The death certificate noted that the immediate cause of death was cardiac arrest due to a cardiopulmonary event (Doc. 83-7, p. 3). No autopsy was performed, a decision that the family was not a part of or consulted on prior to Mr. Lash's body being transported back to Pennsylvania (Doc. 83-1, pp. 27-28). Dr. John Vandover was the emergency physician who treated Mr. Lash at Sparta Hospital the day he died (Doc. 92-7). He testified that his clinical impression of Mr. Lash's death was a cardiac arrest

---

[5] It appears these medications had been prescribed to Mr. Lash sometime before his trip to the emergency room at Sparta Hospital and he took them only as needed (*see* Doc. 92-6).

secondary to asystole, which he agreed meant the arrhythmia (lack of heart rhythm) was the cause of the death (*Id.* at p. 47). Dr. Vandover testified that if he felt strongly that an autopsy was necessary to determine the cause of death, he would have made a notation in the records, and he did not make such a notation (Doc. 92-7, pp. 22-23).

## II.   Plaintiff's Experts

Plaintiff disclosed two expert witnesses: a cardiologist, Dr. Eric Osborn, and a family care physician, Dr. Finley Brown. Additionally, Plaintiff disclosed a nursing expert, Ms. Starlyn Reynolds.

### A.   Dr. Eric Osborn

Dr. Eric Osborn is a cardiologist with a subspecialty in interventional cardiology (Doc. 79-5, pp. 29–34; Doc. 83-8, p. 4). His clinical practice is based at Beth Israel Deaconess Medical Center, which is one of the three major teaching hospitals affiliated with Harvard Medical School, where he is an instructor and the director of the Interventional Cardiology Fellowship (Doc. 79-5, pp. 29–34; Doc. 83-8, p. 4).

Dr. Osborne believes that Mr. Lash most likely suffered a fatal cardiac arrhythmia that led to sudden cardiac arrest (Doc. 83-7). He explained that arrhythmia, which is an irregular heartbeat, leads to abnormal blood circulation and low blood pressure and then ultimately collapse and cardiopulmonary arrest." (Doc. 83-8, p. 6). He further explained that sudden cardiac arrest is often attributable to two major causes: acute coronary syndrome and pulmonary embolus (Doc. 83-8, p. 7).

According to Dr. Osborne, Mr. Lash was objectively at an increased risk of cardiac complications given his smoking history, his weight, his recent diagnosis of

hypertension, his age, and his male gender (Doc. 83-7, p. 4). Given those characteristics, the sudden onset of chest discomfort and shortness of breath that had been intermittent over a couple of days, and the abnormal chest x-ray, Dr. Osborn believes the most likely explanation for Mr. Lash's cardiac arrest is acute coronary syndrome, specifically an unstable angina (Doc. 83-8, p. 7). But other possible explanations include congestive heart failure and pulmonary embolus (Doc. 83-7, p. 4; Doc. 83-8, pp. 6–7, 10). These conditions "warrant[ed] further immediate study so a reasonable treatment plan can be established" (Doc. 83-7, p. 4).

Dr. Osborn opined that the standard of care required Mr. Lash to be admitted to the hospital for a period of clinical observation (at the absolute very least), but also for additional monitoring and diagnostic testing (Doc. 83-7, p. 4; Doc. 83-8, p. 16). Dr. Osborn further opined that the standard of care required Dr. Motwani to consult with a cardiologist in order to determine the appropriate evaluation and management (Doc. 83-7, p. 4).

According to Dr. Osborne, if Mr. Lash had been admitted to the hospital, the cause of his subsequent cardiac arrest may have been identified on subsequent testing and/or monitoring before the event, and may have prevented his cardiac arrest altogether (Doc. 83-7, p. 5). If Mr. Lash had suffered cardiac arrest while in the hospital for observation, he would have had a significantly increased likelihood of successful resuscitation and survival (*Id.*). Dr Osborne opined that, to a reasonable degree of medical certainty, Mr. Lash's premature discharge from the hospital, caused him an increased risk of harm and significantly reduced his chance of survival and recovery (*Id.*)

B.  Dr. Finley Brown

Dr. Finley Brown is a board-certified family practice physician who runs a primary care practice in Chicago Illinois (Doc. 83-10, p. 3).

Dr. Brown stated that Mr. Lash had a "problem list," meaning multiple risk factors, including but not limited to, his age, his gender, his weight, and his history as a former smoker (Doc. 83-7, pp. 2, 4) Dr. Brown is of the opinion that Mr. Lash's vital signs at admission to the emergency room were "quite abnormal" (Doc. 83-9, p. 2). Specifically, his blood pressure was high and his oxygen saturation of 94% and 95% was low, which could be explained by acute heart failure, pulmonary embolus, or chronic obstructive pulmonary disease (*Id.* at pp. 2, 3). Dr. Brown is also of the opinion that the chest x-ray was "wildly abnormal" and the EKG was also abnormal until proven otherwise, and the abnormalities are best explained by acute cardiac disease, congestive heart failure, and/or pulmonary embolus (*Id.* at pp. 3, 4). Dr. Brown stated that Mr. Lash's elevated blood sugar should have also been a concern because "it is well-known that many patients presenting with impending [myocardial infarction]," which is more commonly known as a heart attack, have an elevated blood sugar (Doc. 83-7, p. 3).

According to Dr. Brown, "[s]hortness of breath and chest pain are cardiopulmonary disease . . . until proven otherwise" (Doc. 83-9, p. 2). And "[a]ssociated anxiety means cardiac anxiety until proven otherwise" (*Id.*). Dr. Brown opined that given Mr. Lash's characteristics, the abnormal vitals, labs, chest x-ray, and EKG, the standard of care required immediate cardiac and pulmonary consultations, admission to the intensive care unit, and a detailed workup and evaluation to include serial cardiac

enzymes, d-dimer, ventilation–perfusionscan, CT of the chest, arterial blood gasses, and pulmonary function tests, or stabilization and transfer to a tertiary care, university-affiliated hospital in St. Louis, Missouri, for example, which was 1.25 hours away by ambulance or 20 minutes by air transfer (*Id.* at pp. 2, 4).

In his expert report, Dr. Brown lists fourteen different ways that Dr. Motwani, Dr. Panico, and employees of Sparta Hospital were negligent (Doc. 83-9, pp. 5–6). That list, boiled down, is that the aforementioned failed to properly evaluate the results of the lab tests and diagnostic tests, failed to appreciate what those results meant when paired with Mr. Lash's personal history, presentation, and vital signs, failed to recognize the signs of a potential cardiac or pulmonary problem, and failed to admit Mr. Lash and order an appropriate workup and evaluation, all of which resulted in an improper diagnosis and improper treatment, which directly caused Mr. Lash's death (*Id.* at pp. 5, 6).

Dr. Brown also testified that Dr. Motwani and "other caregivers at Sparta Community Hospital" failed to provide informed consent to Mr. Lash about the possibility that his chest pain, shortness of breath, and anxiety were life-threatening cardiopulmonary disease, including pulmonary embolus, requiring admission to the intensive care unit for workup and evaluation. They also failed to notify Mr. Lash about the congestive heart failure and of the abnormal diagnostic findings, and did not present him with options for treating these findings. Had they provided Mr. Lash with this information, that would have empowered him to insist on aggressive care or transfer to a tertiary care, university affiliated medical center, or at least insist upon not being discharged until he had been further assessed and monitored (Doc. 83-9, p. 5).

C.  Ms. Starlyn Reynolds

Plaintiff also provided a nursing expert, Ms. Starlyn Reynolds. Plaintiff contends that the entirety of Ms. Reynolds' report pertains to negligent acts and omissions by Sparta Hospitals' Staff (Doc. 83-11). However, as fully explained later in this Order, the Court finds that the negligence of nurses at Sparta Hospital is not at issue in this case. Therefore, the Court need not discuss the specifics of Ms. Reynolds' expert report.

### LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008).

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). If the moving party bears the burden of persuasion on an issue at trial, it must "lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. National Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *accord Felix v. Wisconsin Dep't of Transp.*, 828 F.3d 560, 570 (7th Cir. 2016). Where the moving party fails to meet that strict burden, the Court cannot enter summary judgment

for that party even if the opposing party fails to present relevant evidence in response. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a motion for summary judgment, the nonmoving party may not simply rest upon the allegations contained in the pleadings, but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322–26; *Anderson*, 477 U.S. at 256–57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact only exists if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

## DISCUSSION

Dr. Motwani and Sparta Hospital each filed separate motions for summary judgment. The Court will address each party's arguments separately, for the most part, except for defining the relationship between Dr. Motwani and Sparta Hospital as it relates to vicarious liability and Plaintiff's argument centered on the theory of informed consent.

### Sparta Hospital's Motion for Summary Judgment (Doc. 82)

The parties agree that Sparta Hospital is a "local public entity" as defined by the Illinois Hospital District Act, 70 ILL. COMP. STAT. 910/1, *et seq.* (Doc. 83, p. 9). Sparta Hospital argues that, as a local public entity, it is immune from suit under the Illinois Tort Immunity Act, an argument the Court previously addressed in the context of a motion to dismiss (Docs. 83, 41). Sparta Hospital also argues summary judgment is proper, as

Plaintiff cannot establish proximate cause because the hospital cannot be held liable for the actions, or inactions, of Dr. Motwani since he is an independent contractor, which Mr. Lash acknowledged with a signed consent form. Finally, Sparta Hospital argues that Plaintiff is attempting to amend his complaint through his summary judgment responses to include claims that the Hospital is liable for the actions of its nurses. Before the Court addresses Sparta Hospital's arguments related to the Tort Immunity Act, it must first address whether it is liable for the actions of Dr. Motwani and/or the nursing staff.

I.      **Sparta Hospital's Liability for Nurses' Actions**

One of Plaintiff's major arguments is that summary judgment is not appropriate because Sparta Hospital is on the hook not only for Dr. Motwani's breaches of the standard of care, but also for the breaches by Sparta Hospital's staff, including nurses (Doc. 92, p. 9). Sparta Hospital argues that any alleged negligence by the nursing staff is not at issue in this case as there are no allegations of such in Plaintiff's complaint and, therefore, Plaintiff cannot attach liability to the hospital through any alleged actions or inactions of the nurses (Doc. 93). Sparta Hospital argues that even if that were not true, Plaintiff's complaints about the nurse's care of Mr. Lash still predominately relate to issues surrounding his diagnosis and, therefore, Sparta Hospital cannot be held liable as it is immune under the Tort Immunity Act for any claims related to Mr. Lash's diagnosis (Doc. 93, p. 3). According to Plaintiff, however, Sparta Hospital is mischaracterizing her complaint, as she has always included factual allegations against nursing staff by including language like, "SCHD was engaged in the business of providing medical care to patients . . . through its officers, agents, employees and representatives" (Doc. 92, p. 9).

In order to determine if Plaintiff properly brings claims against Sparta Hospital through the actions of its nurses, the Court must first look to the language of the complaint. "[A] party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition to summary judgment." *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017) (quoting *Whitaker v. Milwaukee Cty., Wis.*, 772 F.3d 802, 808 (7th Cir. 2014)). More specifically, "parties cannot 'add entirely new factual bas[e]s . . . not previously presented." *Colbert*, 851 F.3d at 656 (quoting *Whitaker*, 772 F.3d at 808). Case law emphasizes that "it is factual allegations, not legal theories, that must be pleaded in a complaint." *Whitaker*, 772 F.3d at 808. Accordingly, when a plaintiff does plead *legal theories*, it can later alter or refine those theories at summary judgment without a formal amendment to the complaint. *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017). The rule is different, however, when a plaintiff seeks to introduce a new factual basis for his claim that was not previously presented in the pleadings. *Id.* at 859, 860; *Whitaker*, 772 F.3d at 808. "An attempt to alter the factual basis of a claim at summary judgment may amount to an attempt to amend the complaint" and "the district court has discretion to deny the *de facto* amendment and to refuse to consider the new factual claims." *Chessie*, 867 F.3d at 859, 860 (citations omitted).

Here, the Court concludes that Plaintiff is attempting to change the factual theory behind Sparta Hospital's alleged liability in her response to the motion for summary judgment by adding arguments that Sparta Hospital can be held liable for the actions of its nurses. In the complaint, Plaintiff alleges Sparta Hospital is liable for the negligent

actions of its "officers, agents, employees and representatives" (Doc. 1, pp. 12–16). But the only "officers, agents, employees or representatives" specifically identified in the complaint are Dr. Motwani and Dr. Panico (*see id.*). And, the only negligent actions that Plaintiff described are attributed to Dr. Motwani and Dr. Panico. More specifically, Plaintiff alleges Sparta Hospital is liable for a list of 18 negligent actions committed by its agents (Doc. 1, pp. 13–14). Those same 18 actions were directly attributed to Dr. Motwani and Dr. Panico elsewhere in the complaint (*see id.* at pp. 3–4 (listing the negligent actions of Dr. Motwani) and pp. 8–9 (listing the negligent actions of Dr. Panico)).

There is no mention of any purported failure by the nursing staff in the original complaint (*see* Doc. 1), and Plaintiff never sought to amend her complaint to add such allegations. Plaintiff does not mention or describe any acts directly attributable to a nurse in the complaint (*see id.*). Plaintiff does not identify any nurses by name or assert any claims against any nurses (*see id.*). In fact, a review of the complaint reveals that Plaintiff never even uses the word "nurse" in it, not even once (*see id.*). And it stands to reason that if Plaintiff's claims were in any way based on the nurses' negligent actions, then she would have included the word "nurse" in the complaint, which she conspicuously does not do (*see* Doc. 1). The certificate of merit attached to the complaint contains a passing reference to an "RN Triage record." (Doc. 1, pp. 20–22). But that's it – that is the extent to which it references a nurse or nursing in any regard (*Id.*). It is devoid of any reference to any alleged negligent acts or omissions by a nurse.

Simply put, the only fair reading of the complaint is that Plaintiff's claims are based solely on the actions and inactions of Dr. Panico and Dr. Motwani. If Plaintiff's

claims were based on the actions of the nurses at Sparta Hospital, she certainly would have alleged something more specific about nurses in her complaint.

Of course, a pleading can be "constructively" amended when both parties expressly or impliedly consent to the constructive amendment. FED. R. CIV. P. 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue."); *Hutchins v. Clarke*, 661 F.3d 947, 957 (7th Cir. 2011) (applying Rule 15(b)(2) to new issue raised in summary judgment briefing); *Torry v. Northrop Grumman Corp.*, 399 F.3d 876, 877–879 (7th Cir. 2005) (same). The test for permitting a constructive amendment under Rule 15(b)(2) is "whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." *Hutchins*, 661 F.3d at 957.

Neither party makes any argument regarding constructive amendment (*see* Docs. 82, 92, 93), and therefore the Court also declines to spend much time addressing it. Suffice it to say Sparta Hospital expressly objects to litigating any issues pertaining to a nurse deviating from the nursing standard of care (*see* Doc. 93, pp. 2-3; Doc. 83, pp. 4, 6, 7, 8, 15). And Plaintiff has not made any argument that Defendant Sparta Hospital otherwise implicitly consented to it (*see* Doc. 92).

The Court thus concludes that Plaintiff's introduction of new factual theories in her summary judgment briefing is an "an unacceptable attempt to amend the pleadings

through summary judgment argument." *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 541 (7th Cir. 2018) (citations omitted). Consequently, the Court opts to exercise its discretion to deny the constructive amendment and declines to consider the new factual claims. Sparta Hospital cannot be held liable here in this case based on the purported negligence of its nurses.

## II.     Sparta Hospital's Liability for Dr. Motwani's Actions

Now that the nurses are out of the picture, Sparta Hospital can only be held liable through the actions, or inactions, of Dr. Motwani. In Illinois, "a hospital can be found 'vicariously liable for the negligent acts of a physician providing care at the hospital, regardless of whether the physician is an independent contractor, unless the patient knows, or should have known, that the physician is an independent contractor.'" *Williams v. Tissier*, 2019 WL 6905935, ---N.E.3d--- (Ill. App. Ct. 2019), *appeal denied*, 144 N.E.3d 1209 (Ill. 2020) (quoting citing *Gilbert v. Sycamore Mun. Hosp.*, 622 N.E.2d 788, 794 (Ill. 1993)). In order to hold the hospital liable, a plaintiff must show that:

> (1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence.

*Churkey v. Rustian*, 768 N.E.2d 842, 845 (Ill. App. Ct. 2002) (quoting *Gilbert*, 622 N.E.2d at 795). Some Illinois courts have held that executed consent forms disclosing that physicians are not employees of the hospital are "almost conclusive" in determining whether a hospital should be held liable for the medical negligence of an independent

contractor, *Steele v. Provena Hosps.*, 996 N.E.2d 711, 734 (Ill. App. Ct. 2013), while others have said the form is "an important fact to consider" but "is not dispositive." *Williams*, 2019 WL 6905935, at *7 (citing *James v. Ingalls Mem'l Hosp.*, 701 N.E.2d 207, 210–11 (Ill. App. Ct. 1998)). Courts generally look to the circumstances surrounding the executed consent form and the provision itself to determine whether liability attaches, paying close attention to the font of the provision and whether it includes, for example, names of specific doctors. *See, e.g., Churkey,* 768 N.E.2d at 244; *Williams*, 2019 WL 6905935, at *10–12.

Sparta Hospital argues that Dr. Motwani is not their agent; rather, he is an independent contractor, which Mr. Lash acknowledged by signing the release form (Doc. 83, pp. 18-19; Doc. 83-4). Plaintiff does not seem to address this argument, only referring to it tangentially on occasion (*e.g.*, "Thus, Sparta Hospital's argument that . . . Dr. Motwani [was] not its agent[] is irrelevant. The allegations against it, and the evidence, show breaches of duty by its nurses" (Doc. 92, p. 12)). Plaintiff certainly never directly addressed Sparta Hospital's argument that Mr. Lash's signed consent form indicates that Mr. Lash knew, or at least should have known, that Dr. Motwani was an independent contractor (*see* Doc. 92).

Normally, the failure to address an argument results in waiver. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument—as the Bontes have done here—results in waiver."); *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001) (a party's failure to respond to a non-frivolous argument "operates as a waiver"). The Court is reluctant to decide Sparta Hospital's motion for summary

judgment on the basis that Mr. Lash was on notice that his doctor was an independent contractor, however, because even a cursory review of cases shows that absolving a hospital from liability based on consent forms is not a straightforward issue, and there are a number of factors here that may weigh against reliance on the consent form.[6]  For example, the independent contractor provision at issue here is one of eighteen numbered paragraphs on a one-page form (Doc. 83-4). It is in extremely tiny font. It is not bolded, or in capital letters. There is really nothing that calls attention to it or denotes it as more important than the other provisions except that it contains its own line for the patient to initial. Furthermore, it was presented to Mr. Lash to sign in the midst of an emergency medical situation in which he was seeking care from the Hospital itself, rather than looking to the hospital and thinking of it as simply a place where his personal doctor provides care and treatment.

Ultimately though, the Court need not definitively resolve whether Dr. Motwani was an independent contractor or an agent of Sparta Hospital, because even if he was an agent, it is clear that under the Tort Immunity Act, Sparta Hospital would be immune

---

[6] For example, in the case cited to by Sparta Hospital, the plaintiff signed a consent form that indicated her doctors were independent contractors. *Churkey*, 768 N.E.2d at 244. The court held this form established a separate relationship between the hospital and the doctors, because the form itself *included the specific names* of the three different practice groups who were designated as independent contractors. *Id.* at 244, 245. In another case, the court did *not* find that the signed consent form unequivocally established that the plaintiff was informed that the doctors were independent contractors. *Williams*, 2019 WL 6905935, at *10–12. The *Williams* court examined whether the independent contractor provision was mixed in with other consent provisions, where it appeared in the form, the precise language of the provision, the font size of the provision, whether it was bolded or in capital letters, and whether the provision required a separate signature from the patient. *Id.* The length of the form and its multiple contents, which the court called "ambiguities," led the court to conclude that whether the hospital provided meaningful notice to the plaintiff that her doctor was an independent contractor was a material issue of fact. *Id.*

from liability as Plaintiff's complaints are squarely centered in Dr. Motwani's failure to diagnose Mr. Lash appropriately.

### III.   Absolute Immunity under the Illinois Tort Immunity Act

The Illinois Tort Immunity Act immunizes local public entities and public employees from liability for certain types of medical negligence. In particular they are immune from liability if they fail to conduct a physical examination, or fail to conduct an *adequate* physical examination, in order to determine whether a person is suffering from a medical condition that poses a threat to their health. 745 ILL. COMP. STAT. 10/6-105 745 ILL. COMP. STAT. 10/6-105;[7] *Michigan Ave. Nat. Bank v. Cty. of Cook*, 732 N.E.2d 528, 539 (Ill. 2000); *Mills v. Cty. of Cook*, 788 N.E.2d 169, 171 (Ill. App. Ct. 2003). They are also immune from liability if they fail to diagnose a medical condition, if they misdiagnose a medical condition, or if they fail to prescribe treatment for a medical condition. 745 ILL. COMP. STAT. 10/6-106(a);[8] *Michigan Ave. Nat. Bank*, 732 N.E.2d at 539; *Mills*, 788 N.E.2d at 171. They are not, however, immune from liability for negligently or wrongfully prescribing treatment or for any negligence, wrongful act, or omission in administering

---

[7] Section 6-105 states: "Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others." 745 ILL. COMP. STAT. 10/6-105.

[8] Section 6-106(a) states: "Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental or physical illness or addiction or from failing to prescribe for mental or physical illness or addiction." 745 ILL. COMP. STAT. 10/6-106(a).

the prescribed treatment. 745 ILL. COMP. STAT. 10/6-106(c), (d);[9] *Michigan Ave. Nat. Bank*,

732 N.E.2d at 539; *Mills*, 788 N.E.2d at 171.

Case law demonstrates the determination of whether there is immunity under the

Act turns on whether a correct diagnosis was made and whether treatment was

prescribed. *See Antonacci v. City of Chicago*, 779 N.E.2d 428, 434 (Ill. App. Ct. 2002) ("In

short, once the correct diagnosis is made and treatment for it is prescribed, all immunity

bets are off."). Doctors or entities are immunized, however, when they overlook or

incorrectly diagnose a medical condition and consequently fail to provide appropriate

medical care.[10] On the other hand, doctors are not immunized when they make a correct

diagnosis but negligently prescribe or administer treatment for that diagnosis.[11]

---

[9] Section 6-106(c) states: "Nothing in this section exonerates a public employee who has undertaken to prescribe for mental or physical illness or addiction from liability for injury proximately caused by his negligence or by his wrongful act in so prescribing or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury." 745 ILL. COMP. STAT. 10/6-106(c). And section 6-106(d) states: "Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission in administering any treatment prescribed for mental or physical illness or addiction or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury." 745 ILL. COMP. STAT. 10/6-106(d).

[10] *See Johnson v. Bishof*, 33 N.E.3d 624, 643 (Ill. App. Ct. 2015) (immunity where the doctors misdiagnosed patient with muscle spasms and back/buttock contusion and provided her with appropriate treatment for that injury, but patient really had a spinal cord injury; they "treated the wrong diagnosis correctly."); *Wilkerson v. Cty. of Cook*, 884 N.E.2d 808, 815 (Ill. App. Ct. 2008) (immunity where the doctors diagnosed and appropriately treated patient for pregnancy and a vaginal infection, but failed to diagnose that she also had cervical cancer, which ultimately killed her; "[t]he alleged negligence . . . was not based on the treatment [the patient] received, but on the treatment that she should have received had the defendants correctly examined and diagnosed all of her medical conditions."); *Mabry v. Cty. of Cook*, 733 N.E.2d 737, 745 (Ill. App. Ct. 2000) (immunity where patient was misdiagnosed with asthma and appropriately treated for that condition and the doctors never diagnosed or implemented a course of treatment for her true ailment of a pulmonary embolism, which ultimately killed her).

[11] *See Mills*, 788 N.E.2d at 172 (no immunity where differential diagnosis of pneumonia was correctly made and treatment was prescribed pursuant to that diagnosis, but the treatment was inadequate); *Am. Nat. Bank*, 762 N.E.2d at 662 (Ill. App. Ct. 2001) (no immunity where the doctor correctly diagnosed the patient as having a baby in the transverse lie position and appropriately prescribed treatment consisting of regular

Sparta Hospital argues that a "fair reading" of Plaintiff's complaint establishes that Plaintiff's action is a failure to perform examinations or otherwise diagnose Mr. Lash with a cardiopulmonary condition, which Plaintiff argues resulted in his death (Doc. 83, p. 11). Sparta Hospital contends that Dr. Motwani "made an ultimate diagnosis of anxiety reaction," and, "it is also undisputed that Dr. Motwani only treated Mr. Lash for anxiety" (*Id.* at p. 12).

The Court must decide whether this case is mainly about treatment or diagnosis, as that is the central question as to whether the Tort Immunity Act applies. The Court looks first to Plaintiff's complaint. Here, the key for the Court is to look to the *gravamen* of the complaint and evidence before the Court to determine whether Plaintiff mainly pleads issues and presents evidence related to incorrect diagnosis or incorrect treatment. *See e.g., Michigan Ave. Nat. Bank*, 732 N.E.2d at 511; *Johnson v. Bishof*, 33 N.E.3d 624, 645 (Ill. App. Ct. 2015). The Court agrees with Sparta Hospital that, ultimately, Plaintiff's allegations in the complaint relate to issues with Ms. Lash's diagnosis, such as the failure to consider appropriate differential diagnoses; the failure to recognize, appreciate, and address abnormalities in the diagnostic testing; the failure to properly evaluate Mr. Lash's presentation and risk factors; and the failure to perform necessary testing and engage necessary consultations (Doc. 1). It all boils down to a charge that the doctor failed to perform or failed to adequately perform examinations and evaluations that led to the failure to identify Mr. Lash's acute cardiopulmonary disease, which is the ultimate

---

monitoring, testing, and manual maneuvers to determine the baby's position and whether a Caesarean section would be required, but then failed to schedule or perform such testing or manipulation).

allegation of the complaint. The *gravamen* of Plaintiff's complaint is a failure to diagnose, for which the Hospital is immune under the Tort Immunity Act.

The evidence also demonstrates this is a failure to diagnose case, not a failure to treat case. The medical records and corresponding testimony show that Dr. Motwani *did not* diagnose Mr. Lash with or provide any treatment for a cardiopulmonary condition. Dr. Motwani's notes indicate that his "clinical impression" was "anxiety reaction" (Doc. 79-4, pp. 5–6). And he testified that he "made a diagnosis of anxiety reaction" after considering all available information, including Mr. Lash's complaints, medical history, vital signs, physical examination findings, lab work, EKG, and chest x-ray (Doc. 83-5, p. 201). Dr. Motwani further testified that he considered but ruled out any diagnosis related to Mr. Lash's heart. Specifically, he said that the enlarged right hilum identified on the x-ray had nothing to do with Mr. Lash's heart (Doc. 83-5, p. 196). Dr. Panico similarly testified that it was an "incidental finding" unrelated to any cardiopulmonary concerns, and he mentioned it only as a precaution on the off-chance it could potentially lead to an early cancer diagnosis (Doc. 79-7, pp. 6, 10–11). Additionally, while Dr. Panico thought there was evidence of congestive heart failure on the x-ray, Dr. Motwani found that Mr. Lash did not have any clinical signs of CHF based on his physical examination, so "congestive heart failure was not diagnosed" (Doc. 83-5, pp. 187, 222).

There is also nothing in the record that suggests Dr. Motwani provided treatment to Mr. Lash for any cardiopulmonary condition. Rather, the only treatment provided to Mr. Lash was the lorazepam administered to him at Sparta Hospital and the prescription for Xanax given to him at discharge. While the discharge instructions also mentioned the

right hilar enlargement, it was only to say that it was a finding identified on the chest x-ray and Mr. Lash should contact his own physician to determine whether any further evaluation, diagnosis, or treatment was warranted. In other words, Dr. Motwani declined to evaluate the right hilar enlargement in order to diagnose any potential disease associated with it or to provide any treatment for it.

Moreover, there is no expert testimony that Mr. Lash was given the appropriate diagnosis, but the incorrect treatment. *See American Nat'l Bank & Trust Comp. of Chicago v. Co. of Cook,* 762 N.E.2d 654, 661 (Ill. App. 1st Dist. 2001). In fact, Dr. Brown testified that Dr. Motwani's only diagnosis was anxiety (Doc. 83-10, pp. 9, 20). The expert testimony in this case relates to Dr. Motwani mishandling Mr. Lash's complaints, misinterpreting the significance of his vital signs and diagnostic test results, and failing to conduct additional, proper, and necessary consultations, monitoring, and testing, all of which speak to issues with the doctor's failure to properly diagnose Mr. Lash. The record is clear, whether right or wrong, that Dr. Motwani unequivocally ruled out any heart-related issues in his diagnosis of Mr. Lash. And "[a] differential diagnosis that is not chosen and/or treated as the ultimate diagnosis is a misdiagnosis by definition." *Hemminger v. Nehring,* 927 N.E.2d 233, 239 (Ill. App. Ct. April 8, 2010) (citing *Willis v. Khatkhate*, 869 N.E.2d 222, 230 (Ill. App. Ct. 2007)).

Ultimately, the Court must conclude that Sparta Hospital is immunized from Plaintiff's claims under the Tort Immunity Act.

## IV.    Informed Consent

Plaintiff puts forth an additional argument separate from his arguments about

vicarious liability based on the actions, or inactions, of Dr. Motwani, that Sparta Hospital is liable based on a theory of informed consent that is not subject to the Tort Immunity Act (Doc. 92). Specifically, Plaintiff alleged that Sparta Hospital "Failed to provide informed consent to Glenn [Lash] that his symptoms suggested life-threatening cardiopulmonary disease requiring workup and evaluation." (Doc. 1, p. 4). For example, according to Plaintiff, no one told Mr. Lash about the congestive heart failure finding or explained to him the potential significance of his enlarged right hilum (Doc. 92, pp. 3-4). And Plaintiff's experts testified that Mr. Lash would have been "empowered" to insist on a different treatment plan if he had been provided with the pertinent information (*Id.*). According to Plaintiff, it is best left to the jury "to determine whether any alleged undisclosed information would have altered the plaintiff's decision to undergo the proposed treatment had it been disclosed" (Doc. 92, p. 5, citing *Coryell v. Smith,* 653 N.E.2d 1317, 1321 (1995)). Plaintiff's argument misses the mark.

In a medical malpractice claim based on the doctrine of informed consent, the plaintiff is basically contending that they agreed to a particular treatment that they would not otherwise have consented to had they known the material risks of the treatment. *See Crim v. Dietrich*, 67 N.E.3d 433, 438–39 (Ill. App. Ct. 2016) (to prevail on an informed consent claim, the plaintiff must prove that "(1) the physician had a duty to disclose material risks; (2) he failed to disclose or inadequately disclosed those risks; (3) as a direct and proximate result of the failure to disclose, the patient consented to treatment [he] otherwise would not have consented to; and (4) plaintiff was injured by the proposed treatment." (citing *Davis v. Kraff,* 937 N.E.2d 306, 314–15 (Ill. App. Ct. 2010))). In other

words, "a plaintiff must prove that a physician should have informed the patient, prior to administering medical treatment, of the diagnosis, the general nature of the contemplated procedure, the risks involved, the prospects of success, the prognosis if the procedure is not performed and alternative medical treatment." *Crim*, 67 N.E.3d at 434 (internal quotation marks and citation omitted). *See also Davis*, 937 N.E.2d at 315 ("The gravamen in an informed consent case requires the plaintiff to 'point to significant undisclosed information relating to the treatment which would have altered her decision to undergo it.'") (quoting *Coryell v. Smith,* 653 N.E.2d 1317 (Ill. App. Ct. 1995))).

An informed consent claim presupposes that a proper diagnosis was made and that treatment for the diagnosed condition was suggested or ordered without informing the patient of the potential side effects and negative outcomes of that treatment. And it requires the plaintiff to consent to and undergo that treatment. *See, e.g., Davis*, 937 N.E.2d at 314–16 (plaintiff claimed she would not have undergone LASIK surgery had her doctor informed her she had an increased risk of nighttime vision problems following the surgery due to her "abnormally large night-adjusted pupils"); *Coryell,* 653 N.E.2d at 1318 (plaintiff claimed she would not have undergone back surgery had her doctor informed her there was a possibility of developing necrosis and a large scar). None of that happened here. No physician diagnosed Mr. Lash with a life-threatening cardiopulmonary disease. No physician recommended or ordered treatment for a life-threatening cardiopulmonary disease. Therefore, it was impossible for Mr. Lash to consent to any treatment for a cardiopulmonary disease and later come to regret that treatment. And informed consent simply cannot come into play because it would require

the Court to find that Sparta Hospital is liable for treatment that was never given for a diagnosis that was never made.

As such, this theory cannot keep Sparta Hospital in the case, and Sparta Hospital will be dismissed from the present matter as it is immune from suit under the Tort Immunity Act.

### Dr. Motwani's Motion for Summary Judgment (Doc. 90)

Dr. Motwani's sole argument in his motion for summary judgment is that Plaintiff cannot establish proximate cause (Doc. 90).

Under Illinois law, to prove a claim of medical malpractice a plaintiff has the burden of establishing, through expert testimony, (1) the applicable standard of care against which the professional's conduct must be measured; (2) an unskilled or negligent deviation from the standard; and (3) an injury proximately caused by the deviation. *Sullivan v. Edward Hosp.*, 806 N.E.2d 645, 653 (Ill. 2004) (citing *Purtill v. Hess*, 489 N.E.2d 867, 872 (Ill. 1986)). "Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Morisch v. United States*, 653 F.3d 522, 531 (7th Cir. 2011) (citing *Johnson v. Loyola Univ. Med. Ctr.*, 893 N.E.2d 267, 272 (Ill. App. Ct. 2008)). To establish proximate cause, the plaintiff must show "cause in fact and legal cause." *Morisch*, 653 F.3d at 531 (quoting *Bergman v. Kelsey*, 873 N.E.2d 486, 500 (Ill. App. Ct. 2007)). "Cause in fact exists when there is a reasonable certainty that a defendant's acts caused the injury or damage." *Morisch*, 653 F.3d at 531 (quoting *Coole v. Cent. Area Recycling*, 893 N.E.2d 303, 310 (Ill. App. Ct. 2008)). Legal

cause exists when "an injury was foreseeable as the type of harm that a reasonable person would expect to see as a likely result of his or her conduct." *Morisch*, 653 F.3d at 531 (quoting *LaSalle Bank, N.A. v. C/HCA Devel. Corp.*, 893 N.E.2d 949, 970 (Ill. App. Ct. 2008)).

Plaintiff has disclosed two physician experts, both of whom testified that, to a reasonable degree of medical certainty, Plaintiff died because he was discharged from the hospital by Dr. Motwani (Doc. 83-7; Doc. 83-9). Dr. Motwani, however, contends that Plaintiff's experts' reports are insufficient pursuant to Rule 26(a)(2), and therefore they cannot be used to establish proximate cause, and Plaintiff's cause fails at summary judgment (Doc. 90, p. 7). Specifically, Dr. Motwani argues that Dr. Finley Brown had no opinion as to the cause of Mr. Lash's death (*Id.*). And Dr. Osborn's report lists multiple potential causes of Mr. Lash's death, however, his report could only speculate as to whether any of those potential causes may have been discovered prior to his death (*Id.* at p. 9). Dr. Motwani argues that "it is clear that [Dr. Osborn's] opinions are equivocal"— "Mr. Lash may have had a pulmonary embolus, or unstable angina, or primary cardiac arrhythmia not related to unstable angina or pulmonary embolus" (*Id.*). Therefore, according to Dr. Motwani, Dr. Osborn cannot testify, to a reasonable degree of medical certainty that Motwani's conduct was the proximate cause of Mr. Lash's death (*Id.*).

The Court is unpersuaded by Dr. Motwani's argument. It is true that neither Dr. Brown nor Dr. Osborn could definitively say what condition caused the cardiac arrythmia that led to the heart attack that killed Mr. Lash. And really, how could they? Dr. Motwani did not admit Mr. Lash to the Hospital for the observation, testing, and

evaluation necessary to identify that condition. Furthermore, Plaintiff does not have to prove the precise cause of her husband's death. She just has to prove that Dr. Motwani's deviations from the standard of care proximately caused Mr. Lash's injury. Dr. Brown and Dr. Osborn both opined that Motwani's failure to consult with a cardiologist and failure to admit Mr. Lash for additional observation, work-up, and evaluation was negligent, given Mr. Lash's presentation and abnormal test results. Dr. Brown and Dr. Osborn further opined that Dr. Motwani's failures were the proximate cause of an increased risk of harm and significantly reduced Mr. Lash's chance of surviving. That is enough to survive summary judgment.

## CONCLUSION

For the aforementioned reasons, Sparta Hospital's motion for summary judgment (Doc. 82) is **GRANTED**. Sparta Hospital is **DISMISSED** with prejudice as a Defendant in this matter and judgment will be entered in its favor at the close of the case. Dr. Motwani's motion for summary judgment (Doc. 89) is **DENIED**. As such, this case will proceed to trial on Plaintiff's claims against Dr. Motwani alone.

**IT IS SO ORDERED.**

**DATED: March 31, 2021**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**